

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
09/18/2008

| | | |
|---|---|---|
| IN RE: § | | |
| **CYRUS II PARTNERSHIP**, *et al* § | CASE NO: 05-39857 | |
| Debtor(s) § | | |
| § | CHAPTER 7 | |
| § | | |
| **RODNEY D TOW**, *et al* § | | |
| Plaintiff(s) § | | |
| § | | |
| VS. § | ADVERSARY NO. 07-3301 | |
| § | | |
| **SCHUMANN RAFIZADEH**, *et al* § | | |
| Defendant(s) § | | |

### MEMORANDUM OPINION ON DISCOVERY OF UBS SETTLEMENT

For the reasons set forth below, the Court denies discovery on the UBS Settlement. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157.

### *ORIX's Proof of Claim*

Voluntary chapter 7 petitions were filed by Mondona Rafizadeh, Cyrus II Partnership, and Bahar Development, Inc. on June 27, 2005. The precipitating event that gave rise to the petitions was a $10,893,350.96 judgment issued on December 23, 2004 by the 24th Judicial District Court for the Parish of Jefferson, Louisiana. The Louisiana judgment has not been reversed on appeal.[1] The judgment was in favor of ORIX Capital Markets, L.L.C. ("ORIX") and against Debtors.

---

[1] At a recent hearing, lead counsel for ORIX testified that ORIX has recently obtained summary judgment in its favor in the nullity suit.

1

The judgment arose from a $6,400,000 promissory note entered into on or about July 6, 1999, by Cyrus II Partnership and secured by a lien interest in the Arlington Apartments in Harvey, Louisiana. Cyrus' general partner was Bahar Development, Inc.

The loan ("Arlington Loan") was non-recourse, except for limited instances. Mondona Rafizadeh personally guaranteed the loan, but only if one of the defined instances existed that created liability. The 24th Judicial District Court found that liability arose under the note and guaranty because of, *inter alia*, commission of fraud, gross negligence, waste, conversion, failure to provide financial information, failure to make payment on the note and the transfer of the apartments without required consent.

The Louisiana judgment held each debtor personally liable for the remaining principal amount of the debt ($6,282,671.16), accrued non-default interest of $1,274,226.10, default interest of $1,611,673.70, a prepayment premium of $1,268,413.60 and other miscellaneous amounts totaling $456,366.40. The total judgment was for $10,893,360.96 plus attorneys' fees. The Louisiana Court later awarded attorneys' fees and expenses totaling $2,130,649.00. With post-judgment interest, the total amount awarded to ORIX as of the petition date was $14,160,348.75 plus post-judgment attorneys' fees and costs.

Pre-petition, ORIX, seeking to collect the judgment, sued Debtors and allegedly related entities in Louisiana alleging that entities controlled by Mondona's husband, Schuman Rafizadeh, received tens of millions of dollars of fraudulent transfers and that those entities are alter egos of the Debtors ("SBE Litigation").

*The Arlington Loan and the MLMI Trust*

The Arlington Loan was originated by Love Funding Corporation and later sold to UBS Warburg ("UBS"). UBS underwrote the loan and placed it into the Merrill Lynch Mortgage

2

Investors, Inc. Mortgage Pass-Through Certificate Series 1999-CI Trust ("MLMI Trust"). The MLMI Trust is classified as a Real Estate Mortgage Investment Conduit ("REMIC"). As a REMIC, the MLMI Trust is entitled to certain advantageous tax treatment under the Internal Revenue Code. The characteristics of a REMIC are discussed in detail below.

Norwest Bank Minnesota, N.A. was the original Trustee and ORIX was the original master and special servicer for the Trust. ORIX was also an investor in the Trust. Wells Fargo Bank, N.A. later became the Trustee and Key Bank Real Estate Capital Markets, Inc. became the master servicer. ORIX is now the special servicer.

When the Arlington Loan was placed in the Trust, UBS made certain representations and warranties that the loan was a "qualified mortgage" as required by the Trust for it to maintain its REMIC status under the Tax Code. The loan placement was accomplished by two contracts, the Pooling and Service Agreement ("PSA") and the Mortgage Loan Purchase Agreement ("MLPA").

In 2002, ORIX, individually and as special servicer for the MLMI Trust sued UBS Warburg Real Estate Securities, Inc. and UBS PaineWebber, Inc. (collectively, "UBS") for breaches of representations and warranties under the PSA and the MLPA relating to the Arlington Loan and other loans UBS placed in the MLMI Trust. The suit was settled in September 2004 by UBS paying the MLMI Trust approximately $19.4 million. The loans were not repurchased by UBS. Rather, the MLMI Trust retained the loans and collected the settlement amount.

*The Bankruptcy Filing*

The SBE Litigation pending in Louisiana brought by ORIX against Debtors and allegedly related entities was stayed upon the bankruptcy filings. ORIX immediately sought to lift the stay

to proceed with the litigation. Debtors and the other entities contested the motion. The objecting parties argued that ORIX was required to credit all or a portion of the $19.4 million received from UBS to the balance owed by the Debtors. The entities sought discovery from ORIX on ORIX's application of the funds from UBS and whether the application of the funds should have reduced the Debtor's obligations to ORIX.

On September 7, 2005, the Court denied the request for discovery. The Court held that UBS and the Debtors did not have a common liability to ORIX under Louisiana law and that Debtor's obligations under loan documents would not be reduced due to a breach of warranty by UBS.

The Trustee engaged in mediation in an attempt to settle the claims between the Debtors and ORIX. After the mediation failed, ORIX and the Trustee became engaged in several disputes. ORIX is by far the largest creditor of the estate.[2] The Trustee and ORIX eventually settled their disputes, determining that the SBE claims were property of the estate, and that ORIX had standing to act as a co-Plaintiff with the Trustee.

On June 21, 2007, Trustee and ORIX filed this adversary proceeding against Schumann Rafizadeh and a myriad of allegedly related entities. The complaint includes claims for avoidance of fraudulent transfers, breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty and civil conspiracy. It also seeks a finding of single business enterprise and alter ego and requests substantive consolidation, a constructive trust and an accounting.

---

[2] There are no other secured claims of the estate. Non-Orix unsecured claims total approximately $151,041.11. ORIX has agreed, as part of its settlement with the Trustee and the Funding Agreements it has entered into with the estate, to subordinate its claims to $151,041.11 in unsecured claims.

*Request for Discovery Related to Double Recovery*

Certain Defendants' (hereafter, "Movants") argue that recovery in this proceeding would equate to double recovery due to ORIX's recovery in the UBS settlement. Movants allege the following:

- The MLMI Trust is a REMIC. As a REMIC, the Trust may collect income in the form of principal, interest and direct costs associated with the mortgage loans, only. Any other income is classified by the Tax Code as "prohibited income" and is subject to a 100% tax. The Trustee of the MLMI Trust is prohibited by the PSA from taking any action which would result in a 100% tax.[3] Accordingly, the Trustee of the MLMI Trust lacks standing to pursue income that will result in a 100% tax.

- The proceeds from the ORIX / UBS Settlement are, in part, attributable to the Arlington Loan. Because of the prohibitions imposed on REMICs for income collection, the applicable Settlement proceeds must be applied directly to the principal, interest and direct costs on the Arlington Loan. Therefore, the balance due on the Arlington Loan (for which Debtors are liable) should be reduced. Because the balance due on the Arlington Loan should be reduced, some recovery sought in this proceeding will result in a recovery amount greater than the balance due on the Arlington Loan.

Two separate theories of double recovery emerge from these allegations:

- Because the amounts recovered in the ORIX / UBS Settlement must be applied directly to the Arlington Loan, a portion of the amount Plaintiffs are seeking to collect has already been recovered; and

---

[3] To argue that the Trustee lacks standing, Defendants cite § 10.01(i) if the PSA which provides:
> None of the REMIC Administrator, Master Servicer, the Special Servicer, the REMIC Administrator, or the Trustee shall knowingly take (or cause any of REMIC I, REMIC II or REMIC III to take) any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any REMIC I, REMIC II or REMIC III as a REMIC, or (ii) except as provided in Section 3.17(a), result in the imposition of a tax upon any of REMIC I, REMIC II or REMIC III
> (including, but not limited to, the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code, the tax on contributions to a REMIC set forth in Section 860G(d) of the Code or the result in the imposition of a tax on "new income from foreclosure property" as defined in Section 860G(c) of the Code) (any such endangerment or imposition, except as provided in Section 3.17(a)(iii), an "Adverse REMIC Event"), unless the REMIC Administrator has obtained or
> received an Opinion of Counsel (at the expense of the party requesting such action or at the expense of the Trust Fund if the REMIC Administrator seeks to take such action or to refrain from acting for the benefit of the Certificateholders) to the effect that the contemplated action will not result in an Adverse REMIC Event.

PSA § 10.01(i).

- Any over-recovery would be prohibited income and subject to a 100% tax. Therefore, ORIX, as special servicer for the Trustee of the MLMI Trust, lacks standing to pursue this income.

To determine the application of the Settlement proceeds, Movants request discovery to investigate the components of the Settlement payment and specifically why the Settlement payment was made. Movants also argue that under Louisiana law, Debtors and UBS are *in solido* liable.

Plaintiffs argue that the Settlement proceeds were to compensate the Trust for UBS's beach of warranties causing the Trust to overpay for the package of loans, not to reduce the obligor's liability on the note.

*Analysis*

Pursuant to Federal Rule of Civil Procedure 26(d) and Federal Rule of Evidence 401, Movants are entitled to all non-privileged discovery on any relevant matter. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. When the Court considered ORIX's motion for relief from the stay and Debtors' objection, the Court reviewed the ORIX / UBS Settlement Agreement. After review, the Court found that the Settlement did not reduce Debtors' liability on the note. The Court, at that time, denied discovery on the Settlement.

Movants' arguments set forth above, however, were not offered at the time of consideration of the motion for relief from the stay. On May 15, 2008, the Court held a hearing on this matter. To determine whether the discovery Movants seek is relevant, the Court must examine the required application of the Settlement proceeds pursuant to the MLPA, PSA and the Tax Code.

6

*The Mortgage Loan Purchase Agreement*

The agreement between ORIX and UBS was governed by the MLPA.  Section 3.3(b) of the MLPA provides for "Remedies for Breach of Certain Representations and Warranties."  It provides that if a breach of a warranty is discovered, there are three options for recovery: (1) cure the default; (2) repurchase the loan; or (3) provide a substitute loan.  The MLPA continues to state that "the obligations of the Mortgage Loan Seller set forth in this Section 3.3(b) to cure, repurchase or substitute for a Defective Mortgage Loan constitute the sole remedies available to the Purchaser…"

ORIX asserts that on learning of the breach of warranties, the MLMI Trust sought two types of relief from UBS: (1) An order requiring UBS to repurchase the loans; or (2) reimbursement to the Trust for the amount the Trust overpaid for the loans.

Movants point to damage calculation models and expert testimony used in the ORIX / UBS litigation claiming that such information showed ORIX intended to request the full repurchase price for the Arlington Loan and that this was equivalent to a payment on the loan.  ORIX asserts that Movants misunderstood the damage calculation models and expert testimony and that neither supports a finding that payment was made on the Arlington Loan.

After review, the Court concludes that nothing in the damage models or expert testimony suggests that ORIX intended for the UBS payment to actually pay on the Arlington Loan note.

Furthermore, ORIX points to language in the Settlement Agreement and argues that it shows that the MLMI Trust remained owner of the loans and retained the rights to proceed against borrowers and guarantors for the entire amounts due on the loans.  The Settlement Agreement states:

> [T]he Trust shall *retain all of its rights* in and to all Mortgage Loans owned by the
> MLMI Trust, including those which are the subject of the Litigation, as well as all

collateral securing such Mortgage Loans and *all claims by the MLMI Trust against borrowers and/or guarantors* in connection with such Mortgage Loans."

docket no. 445 ¶ 16. Accordingly, after examining the MLPA, the Settlement Agreement and the parties briefing, the Court finds that nothing in the Settlement Agreement, itself, causes the funds to be applied to the principal and interest due on the mortgage notes.

### *REMIC Requirements under the Tax Code*

REMIC Trusts are governed by 26 U.S.C. § 860A – G. Section 860D defines a REMIC as an entity where substantially all of the assets "consist of qualified mortgages and permitted investments." 26 U.S.C. § 860D(a)(4). A permitted investment is any "(A) cash flow investment (B) qualified reserve asset, or (C) foreclosure property." *Id.* at 860G(a)(5). A cash flow investment is "any investment of amounts received under *qualified mortgages* of a temporary period before distribution to holder of interest in the REMIC." *Id.* at 860G(a)(6) (emphasis added). Cash flow investment is further defined by the Treasury Regulations:

> **(g) Permitted investments--(1) Cash flow investment--(i) In general.** For purposes of section 860G(a)(6) and this section, a cash flow investment is an investment of payments *received on qualified mortgages* for a temporary period between receipt of those payments and the regularly scheduled date for distribution of those payments to REMIC interest holders. Cash flow investments must be passive investments earning a return in the nature of interest.
>
> **(ii) Payments** *received on qualified mortgages*. For purposes of paragraph (g)(1) of this section, the term "payments *received on qualified mortgages*" includes—
> . . . .
> > (D) A payment by a sponsor or prior owner in lieu of the sponsor's or prior owner's repurchase of a defective obligation, as defined in paragraph (f) of this section, that was transferred to the REMIC in breach of a customary warranty;
> > . . . .

26 C.F.R. § 1.860G-2(g)(1)(ii)(D) (emphasis added). A defective obligation includes a mortgage that "does not conform to a customary representation or warranty…" *Id.* at § 1.860G-2(f)(iv).

8

The parties agree that the funds received by ORIX from the UBS Settlement likely fall within § 1.860G-2(f)(D). Funds received under that section qualify as a permitted, cash flow investment. However, Movants argue that although this is a permitted investment, ORIX is not complying with the required application of the Settlement Funds as a permitted, cash flow investment. Movants point to the definition of "temporary period":

> **iii) Temporary period.** For purposes of section 860G(a)(6) and this paragraph (g)(1), a temporary period generally is that period from the time a REMIC receives payments on qualified mortgages and permitted investments to the time the REMIC distributes the payments to interest holders. A temporary period may not exceed 13 months. Thus, an investment held by a REMIC for more than 13 months is not a cash flow investment.

26 C.F.R. § 860G-2(g)(iii). To avoid holding a cash flow investment longer than 13 months, Movants assert that the PSA requires any such funds be applied to principal and interest and distributed to Certificateholders. Movants argue that any payment received over the principal and interest amount or not applied to the principal and interest amount, therefore, cannot be a payment "*received on a qualified mortgage*," is not a permitted investment, and is prohibited income. Furthermore, Movants assert that excess funds, in this instance, would be generated as a result of a litigation claim and not a qualified mortgage. Therefore, the funds are prohibited income.

ORIX argues that "prohibited income" is defined in the Code and only that specifically stated income is prohibited. Section 860F defines prohibited transactions as (1) dispositions of qualified mortgages; (2) income from a nonpermitted asset (which is receipt of income from something other than a qualified mortgage or permitted asset); (3) compensation for services; and (4) gain from disposition of cash flow investments. 26 U.S.C. § 860F(a)(2). Under § 860C(a), ORIX argues that certain Certificateholders (discussed below) are treated as equity holders. The PSA provides for distribution to these equity holders after distributions to all

9

Certificateholders who are treated as debt-holders. As such, ORIX argues that the collection and distribution of greater than 100% of the principal and interest amount is anticipated by the Tax Code and the PSA, is not set forth in § 860F, and is not, therefore, prohibited income.

The two issues for the Court are whether (i) the proceeds were required to be applied in a manner that credited the Debtors' obligations and (ii) Orix has standing to bring the current lawsuit. The Court is not concerned about whether the receipt of funds by the REMIC and the internal application of funds was appropriate from a taxation viewpoint. The Court cannot and does not revisit the taxation of the UBS Settlement.

The parties agree that the Settlement proceeds were permitted funds. Likewise, there is no question that actual payment on the Arlington Loan would be a payment on a qualified mortgage. No party has shown that the applicable sections of the Tax Code, standing alone, prohibit collection of greater than 100% of the principal and interest on any loan in the MLMI Trust. While the Tax Code does anticipate that payments may be made to the trust resulting from breaches of warranties (26 C.F.R. § 1.860G-2(g)(1)(ii)(D)), the Code does not address how those funds must be applied. The parties' arguments center on how the PSA requires application of the funds to comply with the Tax Code. The Court, therefore, examines how incoming funds must be treated under the PSA.

*Treatment of the Settlement Funds under the PSA*

*a. Explicit Application of Funds under the PSA*

Section 2.03 of the PSA provides for the procedure upon "breach of any representation or warranty relating to the Mortgage Loans set forth in the applicable Mortgage Loan Purchase Agreement." PSA § 2.03(a). It provides that the sole remedies allowed are those set forth in the MLPA which are "cure, which shall include payment of losses and any Additional Trust Fund

Expenses," repurchase, and substitute. *Id.* The treatment of principal and interest in a repurchase or substitution of a loan is clear. However, "cure" is not defined. Arguably, a "cure" occurred in this case.

Article III of the PSA provides the procedures for administering and servicing the Trust. This includes provisions as to the collection of funds by the Trust. Section 3.02 specifically governs the collection and application of payments to principal and interest. It states:

> All amounts collected on any Mortgage Loan in the form of payments from Mortgagors, Insurance and Condemnation Proceeds or Liquidation Proceeds shall be applied to amounts due and owing under the related Mortgage Note or Mortgage Notes (including, without limitation, for principal and accrued and unpaid interest) in accordance with the express provisions of each related Mortgage Note and the related Mortgage….

PSA § 3.02(b). The terms "Insurance and Condemnation Proceeds" and "Liquidation Proceeds" are defined by the PSA. "Liquidation Proceeds" includes the "repurchase of a Mortgage Loan by the applicable Mortgage Loan Seller pursuant to the related Mortgage Loan Purchase Agreement." PSA, p. 19. [4] The Settlement proceeds, however, do not fall in the category of Liquidation proceeds.[5]

---

[4] Section 1.01 of the PSA defines "Liquidation Proceeds" as: All cash amounts (other than Insurance and Condemnation Proceeds and REO Revenues) received by the Master Servicer or the Special Servicer in connection with: (i) the taking of all or a part of a Mortgaged Property by exercise of the power of eminent domain or condemnation, subject, however, to the rights of any tenants and ground lessors, as the case may be, and the terms of the related Mortgage; (ii) the liquidation of a Mortgaged Property or other collateral constituting security for a defaulted Mortgaged Loan, through trustee's sale, foreclosure sale, REO Disposition or otherwise, exclusive of any portion thereof required to be released to the related Mortgagor in accordance with applicable law and the terms and conditions of the related Mortgage Note and Mortgage; (iii) the realization upon any deficiency judgment obtained against a Mortgagor; (iv) the purchase of a Defaulted Mortgage Loan by the Master Servicer or the Special Servicer pursuant to Section 3.18(b); (v) the repurchase of a Mortgage Loan by the applicable Mortgage Loan Seller pursuant to the related Mortgage Loan Purchase Agreement; (vi) the purchase of a Mortgage Loan or REO Property by the Depositor, the Special Servicer or the Master Servicer pursuant to Section 9.01, or (viii) the substitution of Qualified Substitute Mortgage Loan for a deleted Mortgage Loan.

[5] Defendants, however, have also argued that ORIX has defined the Settlement recovery as "liquidation proceeds" as that term is defined in the PSA, which requires applications of such proceeds to a specific loan in its Master Servicer and Special Servicer Notice to Certificateholders Regarding Distribution of Settlement Payments. docket no. 425 ¶ 42. The Notice stated, in part:

The Court finds that these proceeds, therefore, are not bound to be applied in accordance with § 3.02(b).[6] The Court has not located another provision in the PSA that explicitly requires the application of funds to amounts owing on the mortgage notes. Accordingly, the Court rejects the argument that the PSA explicitly requires these proceeds to be applied to the mortgage notes.

Movants, however, argue that § 3.04 of the PSA requires that any mortgage loan payments received must be immediately deposited into a Certificate Account and then transferred monthly to a Distribution Account. Funds are then distributed to Certificateholders in accordance with the "waterfall" provisions of Article IV.[7] Movants argue that it is Article IV that requires that all distributions to Certificateholders be applied to principal and interest. This

---

> [ORIX]… hereby notifies Certificateholders of the MLMI Trust that [ORIX] has determined that the $19.375 million cash payment received by the Trust from or on behalf of the defendants in accordance with the terms contained in the Settlement Agreement (the "*Settlement Payment*") constitute "Liquidation Proceeds" as that term is defined in the [PSA]; and further that such Liquidation Proceeds shall be treated as having been received in respect of the [Lee Hall Loan]….
>
> In accordance with and as a consequence of the characterization by [ORIX] of the Settlement Payment as Liquidation Proceeds attributable to the Lee Hall Loan, ORIX has certified to [Wells Fargo] that the distribution of the Settlement Payment … is consistent with the requirements of the PSA.

docket no. 699, Exh. A. Defendants then cite to § 3.02 of the PSA and argue that because ORIX characterized the proceeds as "liquidation proceeds" discovery is required to determined whether the funds were, or should be, paid directly on the mortgage note. ORIX responds the proceeds where merely "characterized" as "attributable to" the Lee Hall loan and that it purposefully did not use language to suggest a payment had been made on the loan. The Court finds Defendants' argument without merit. The Settlement Agreement included language stating:

> [T]he Trust shall *retain all of its rights* in and to all Mortgage Loans owned by the MLMI Trust, including those which are the subject of the Litigation, as well as all collateral securing such Mortgage Loans and *all claims by the MLMI Trust against borrowers and/or guarantors* in connection with such Mortgage Loans.

docket no. 445 ¶ 16. Accordingly, the MLMI Trust remained owner of the loans and has the rights to proceed against borrowers and guarantors for the entire amounts due on the loans.

[6] The Court recognizes that an argument could be made that because these proceeds are not contemplated, they are not permitted. However, "cure, which shall include payment of losses and any Additional Trust Fund Expenses," is specifically provided for in § 2.03, and specifically excluded from § 3.02.

[7] The parties agree that the "waterfall" operates as follows: The PSA structures the certificates in multiple tranches with successive layers of subordination. All but the lowest class of certificates is treated as "Regular Certificates." Subordinated to the Regular Certificates are the Residual Certificates. Amounts are applied to interest, principal and reimbursement of realized losses to the certificateholders in order of seniority. Losses, however, are borne in the opposite order.

must be done, Movants assert, to avoid violating the temporary period set forth in 26 C.F.R. § 860G-2(g)(iii). If the temporary period is violated, an otherwise permitted cash flow investment risks becoming a prohibited transaction.

ORIX agrees that funds received by the MLMI Trust are required to be distributed to the certificateholders under the waterfall set forth in Article IV and that this distribution scheme applies to the funds received from the Settlement. docket no. 662 at p.9. However, ORIX argues that an event such as the collection of the Settlement payment was simply not contemplated by the PSA. For that reason, the recovery was treated as having been "received in respect of" the worst performing loan in the Trust. The payment, however, was not applied to an actual balance due on any loan. ORIX asserts, when and if payment is made on the worst performing loan, the funds will be reallocated to the next worst performing loan, and so on. In the event the MLMI Trust collects greater than the amount of principal and interest to be paid into the Trust, the excess funds will be distributed to the Residual Certificateholders.

Section 3.04 governs the operations of the Certificate and Distribution Account. It provides that the Master Servicer shall maintain a Certificate Account into which the Master servicer "shall deposit…the following payments and collections received":

  i. all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

  ii. all payments on account of interest (other than Additional Interest) on the Mortgage Loans (net of the Master Servicing Fees and Retained Fees) including Penalty Charges, Percentage Premiums and Yield Maintenance Charges;

  iii. all Insurance and Condemnation Proceeds and Liquidation Proceeds received in respect of any Mortgage Loan or REO Property (other than liquidation Proceeds that are received in connection with the purchase… of all the Mortgage Loans and any REO Properties in the Trust Fund and that are to be deposited in the Distribution Account pursuant to section 9.01).

13

    iv. any amounts required to be transferred from the REO Account pursuant to section 3.16(c);

    v. Any amounts required to be deposited by the Master Servicer pursuant to Section 3.06 in connection with losses incurred with respect to Permitted Investments of funds held in the Certificate Account; and

    vi. any amount required to be deposited… in connection with losses resulting from a deductible clause in a blanket hazard or a master single interest policy.

PSA § 3.04. Section 3.04 continues to list what must be transferred from the Certificate Account into the Distribution Account. This includes:

    i. all amounts constituting the Available Distribution Amount[8] for the immediately following Distribution Date;

    ii. Any amounts required to be deposited…. in connection with Prepayment Interest Shortfalls;[9]

    iii. any P&I Advances ...;[10]

    iv. any Liquidation Proceeds …in connection with purchase of all the Loans and any REO Properties in the Trust Fund pursuant to Section 9.01…;

    v. any Prepayment Premiums; and[11]

    vi. any other amounts required to be so delivered for deposit in the Distribution Account pursuant to any provision of this Agreement.

---

[8] Available Distribution Amount is a defined term. It is defined, in part, as an amount equal to: "(a) the sum of (i) the aggregate of the amounts on deposit in the Certificate Account and the Distribution Account as of the close of business on the related Determination Date and the amounts collected by or on behalf of the Master Servicer as of the close of business on such Determination Date and required to be deposited in the Certificate Account." PSA § 1.01.

[9] Prepayment Interest Shortfall arises when a loan is paid early. It is essentially the amount of Interest that would have accrued during the period "commencing on the date as of which such Principal Prepayment was applied to such Mortgage Loan and ending on the day immediately preceding such Due Date." PSA § 1.01

[10] Principal and Interest advances are advances of principal and interest from the Master Servicer from its own funds, if necessary, to replace schedules payments that have not been made by loans in the Trust.

[11] Defined as "[a]ny Yield Maintenance Charge or Percentage Premium paid or payable, as the context requires, by a Mortgagor in connection with a Principal Prepayment." PSA § 1.01

PSA § 3.04. Section 4.01 then provides, "the Paying Agent shall… apply amounts on deposit in the Distribution Account… in the following order of priority." It continues to list priority of distribution.

While the Certificate Account provides that funds deposited in it include payments "on account" of principal and interest, neither the Certificate Account provision nor the Distribution Account provision provides that these funds must be applied to the actual Mortgage Note. Section 3.02(b) is the exclusive provision cited to the Court that addresses what funds should be used to pay down the notes.

However, the Court finds it still must examine the question of whether recovery of greater than 100% of the amounts due on the loans in the trust would result in prohibited income which may take away ORIX's standing.

*b. Recovery of Greater than 100%*

ORIX asserts that in the event the MLMI Trust collects greater than the amount of principal and interest to be paid into the Trust, the excess funds will be (and are permitted to be) distributed to the Residual Certificateholders without adverse tax consequences.

First, ORIX points to § 4.01(a)(xxxii). Section 4.01 sets forth the priority of distributions of funds among the Certificateholders. Subsection xxxii provides for distributions to the residual certificateholders "in an amount equal to the balance, if any, of the Available Distribution Amount for such Distribution Date remaining after the distributions to be made on such Distribution Date… [to the regular certificate holders]." PSA § 4.01(a)xxxii. As set forth above, the Available Distribution Amount is a defined term, meaning essentially, as the amount in the Certificate Account and Distribution Account at the close of business on the Determination Date that should be in the Distribution Account. PSA § 1.01

Second, ORIX argues, as set forth above, that § 860C(a) of the Tax Code anticipates treating residual certificateholders as equity holders.

Third, ORIX argues that on termination of the Trust, the PSA provides that "Amounts on deposit in the Distribution Account as of the final Distribution Date… shall be allocated in the same order of priority set forth in Section 4.01(a), in each case to the extent of remaining available funds."  PSA § 9.01 at p. 163.  In effect, ORIX is arguing that because the PSA provides for distributions to equity holders, it must be contemplated that funds greater than the principal and interest amounts will be collected.

In the Movants brief, they do not address the rights of the Residual Certificateholders.  Rather, the Movants, citing to I.R.C. § 830G(a)(1)(A) and (B) [12] defining "regular interest," emphasize that the Regular Certificateholders are entitled to receive only a specified amount of principal and interest.  Next, assuming the Settlement payments must be applied to principal and interest—a theory the Court rejects—Movants argue that once the full amount of the note is paid, any funds received on the note are not funds received on a "qualified mortgage" and are therefore, prohibited income.

The Court finds that the scheme of the PSA allows for distribution to Residual Certificateholders after full distribution to Regular Certificateholders.  Accordingly, the Movants' argument that the receipt of funds from this lawsuit would result in the receipt of prohibited income fails.

---

[12] The IRC provides:  The term "regular interest" means any interest in a REMIC which is issued on the startup day with fixed terms and which is designated as a regular interest if-- (A) such interest unconditionally entitles the holder to receive a specified principal amount (or other similar amount), and (B) interest payments (or other similar amount), if any, with respect to such interest at or before maturity (i) are payable based on a fixed rate (or to the extent provided in regulations, at a variable rate), or (ii) consist of a specified portion of the interest payments on qualified mortgages and such portion  26 U.S.C. § 860G

*In Solido Liability*

Movants request that this Court revisit its decision regarding whether there is *in solido* liability between the debtors and UBS. This Court explained its reasoning at docket entry #80 in case 05-39857.

Although the Court incorporates its prior order by reference, the following paragraph from docket entry # 80 may be helpful to an overall understanding:

> When the Debtors signed the loan documents, they became obligated to the holders of the debt. UBS Warburg was never a maker of the note. UBS allegedly breached an independent obligation that it had to Orix. When it settled its breach by the payment of $19.4 million, UBS could have negotiated that it would have paid more to Orix for the transfer of the note to UBS. Or, UBS could have paid less and left the note with Orix. UBS Warburg's breach was independent of the Debtors' payment obligation. If UBS had acquired the note as part of its settlement (i.e., UBS had paid $19.4 million and received the note from Orix), the Debtors would have no conceivable argument that the Debtors would be entitled to a credit for UBS's payment. The transaction that occurred was wholly independent of the Debtors' obligation to pay on the note. Because UBS Warburg paid less and left the note with Orix, the Debtors allege that they are entitled to a credit. Logic dictates that the amount owed by the Debtors should not be affected by the structure of a settlement between third parties.

The Movants are attempting to absolve their liability on the note without making any payment by arguing that the Court is allowing the MLMI Trust to obtain a windfall in the form of a double recovery. The Court rejects the argument.

As set forth above, liability was imposed on the Debtors after the Louisiana Court found that they had engaged in fraudulent conduct. The Court believes that the situation is best analogized to the rights of a purchaser of a note. Under the UCC, the purchaser of the note is entitled to collect the note to the full extent of the maker's original liability. *See Tex. Bus. & Com. Code* § 3.203(b). The discounted purchase price of the note is not considered by the Court.

17

Yet, in this case, the Movants request that the Court credit the note with all or a part of the cure payment made by UBS. The Court sees no difference between the original sale of a note at a discount and the sale of a note at par, followed by a refund of a portion of the purchase price.

Equity does not allow special relief to the Movants. Neither does the law.

### *Conclusion*

The Court discerns no relevance of the UBS transaction to the issues in this adversary proceeding. Accordingly, the motion to allow discovery into that matter is denied.

Signed at Houston, Texas, on September 11, 2008.

MARVIN ISGUR
United States Bankruptcy Judge